# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **DAVID E. CAMERON, et al.,** | : | |
| | : | **Case No. 2:12-CV-00168** |
| **Plaintiffs,** | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **HESS CORPORATION, et al.,** | : | **Magistrate Judge Deavers** |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

This matter is before the Court on the Motion of Plaintiffs David Cameron, Melissa Griffith, Stephen J. Griffith, and John and Jane Doe (collectively "Plaintiffs") for Partial Summary Judgment, (Doc. 37), the Cross-Motion of Defendants Hess Corp., Hess Ohio Developments, LLC, and Hess Ohio Resources, LLC (collectively "Hess") for Partial Summary Judgment, (Doc. 42), and the Motion of Defendant Mason Dixon Energy, Inc. ("Mason Dixon") for Summary Judgment, (Doc. 51). For the reasons set forth herein, Plaintiffs' Motion is **GRANTED** in part and **DENIED** in part, Hess's Motion is **DENIED**, and Mason Dixon's Motion is **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

### A. Factual History

This action arises out of oil and gas leases purportedly executed between Defendant Mason Dixon and Plaintiffs Stephen and Melissa Griffith (the "Griffiths"), and between Mason Dixon and Plaintiff David Cameron ("Cameron"). In the spring of 2007, Mason Dixon approached the Griffiths about an oil and gas lease for their 228.6 acre dairy farm in Jefferson County, Ohio. On June 14, 2007, the Griffiths purportedly executed a written "Oil and Gas

Lease" agreement with Mason Dixon (the "Griffiths Lease"), (Doc. 37, Ex. A). Melissa Griffith, however, did not sign the Griffiths Lease. *Melissa Griffith Dep*. at 36. Rather, Plaintiffs allege that Mason Dixon's representative first directed Stephen to sign on his wife's behalf (which he did) and then notarized the resulting document. *Stephen Griffith Dep*. at 30-32.

Approximately one year later, Mason Dixon approached Cameron about an oil and gas lease for his 166.36 hay and cattle farm, which adjoins the Griffiths' dairy farm in Jefferson County.  On June 27, 2008, Cameron purportedly executed a written "Oil and Gas Lease" agreement with Mason Dixon (the "Cameron Lease"), (Doc. 37, Ex. B).  Plaintiffs assert that the Cameron lease was improperly notarized, as the notary was not present at the time the Cameroun Lease was executed. *Cameron Dep*. at 27, 30.

The terms of the Griffith and Cameron Leases, which contain largely identical language, granted the Lessee[1] "exclusive right to enter upon" certain lands in Mt. Pleasant Township, Jefferson County, Ohio in order "to conduct geological and geophysical surveys and explorations, and to operate for, produce, and save oil and gas… and to inject gas, air, water or other fluids into the subsurface strata of said lands for the recovery and production of oil and gas, together with the right to drill wells." Griffiths Lease at ¶ 3; Cameron Lease at ¶ 3.

<u>1. Assignment of Griffiths and Cameron Leases</u>

Both the Griffiths and Cameron Leases allow for the rights of either party to be assigned in whole or in part, provided that no such change, "however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee." Griffith Lease at ¶ 11, Cameron Lease at ¶ 11. Pursuant to this clause, on December 15, 2008, Mason Dixon filed two "Assignment of Oil and Gas Leases" with the Jefferson County, Ohio, Recorder: one assigning the property

---

[1] "Lessee," as referenced herein, refers to either Mason Dixon, Marquette, or Hess, depending on the specific time period referenced.

conveyed under the Griffith Lease, identified at OR Volume 867, pages 838-839; and another

assigning the property conveyed under the Cameron Lease, identified at OR Volume 867, pages

852-853. *See Bowers Aff.*, Doc. 51-1 (attaching relevant assignments). Through these

assignments, Mason Dixon purportedly conveyed all of its "right, title and interest, in and to" the

Griffith and Cameron Leases to Marquette Exploration, LLC ("Marquette"), "subject to the

terms, provisions, covenants, and royalties" set forth in the original leases. The Griffiths and

Cameron Leases were subsequently assigned to Hess Ohio Resources, LLC.

<u>2. Griffiths Lease Term</u>

The Griffiths Lease contains a "habendum clause," which provides:

> It is agreed that this lease shall remain in force for a term of five (5) year(s) from
> [June 14, 2007], and as long thereafter as oil or gas . . . or either of them, is
> produced from said land by the Lessee, its successors and assigns. Lessee has the
> option to extend this lease for an additional term of five (5) years(s) from the
> expiration of the primary term of this lease, and as long thereafter as oil or gas …
> or either of them, is produced from said land by the Lessee, its successors and
> assigns, said extension to be under the same term of this lease. Lessee, it
> successors or assigns, may exercise this option to extend if on or before the
> expiration date of the primary term of this lease, Lessee pays or tenders to the
> Lessor or to the Lessor's credit, an amount per mineral acre equal to two (2) times
> the amount per net mineral acre paid to Lessor upon the execution of this lease.

Griffith Lease ¶ 2. The parties do not dispute that, pursuant to the habendum clause, the primary

term of the Griffiths Lease is five years. Based on the above, the primary term was scheduled to

expire in June 2012.

In addition, the Griffith Lease contains a "delay rental" provision, which provides that,

> If operations for drilling are not commenced on the leased premises, or on acreage
> pooled therewith, on or before twelve (12) months from [June 14, 2007], this
> lease shall then terminate as to both parties unless Lessee, on or before the
> expiration of said period, shall pay or tender to Lessor the sum of Five and no/100
> ($5.00) Dollars per net mineral acre of the associated lease, hereinafter called the
> "delay rental," which shall extend for twelve (12) months the time within which
> drilling operations may be commenced. Thereafter, annually, in like manner and

upon like payments or tenders, the commencement of drilling operations may be further deferred for periods of twelve (12) months each during the primary term.

Griffith Lease ¶ 4.

It is undisputed that, to date, no drilling activity of any kind has taken place on the property covered by the Griffiths Lease, and the Griffiths have received no royalties of any kind under the terms of the Griffiths Lease.

After execution of the Griffith Lease, the Lessee made four annual Delay Rental payments, in the amount of $1,143.00 each, in 2008, 2009, 2010, and 2011. Hess asserts that the Lessee thereby satisfied its contractual obligations for the entirety of the primary term of the Griffith Lease, or until June 14, 2012. *S. Griffith Depo*. at 46-52; *M. Griffith Depo*. at 45-53, Exs. C, D, E, F. In addition, in May 2012, the Lessee tendered to the Griffiths an extension payment of $13,716, intended to extend the lease term for an additional five years (*i.e*., through June 2017), pursuant to paragraph 2 of the Griffith Lease. *Countercl.*, Doc. 32, ¶ 53; *Pls.' Answer* ¶ 53; *Ivy Phillips Aff*. at ¶¶ 5-7. For the purposes of Plaintiffs' motion for summary judgment, the Griffiths do not dispute that Hess (or its processor in interest, Marquette) attempted all payments called for under the Griffith Lease. (Doc. 37-1 at 3.) Hess argues that, because the Lessee tendered the payments above, the Griffiths Lease remains in effect, and has not terminated pursuant to the "delay rental" provision.

Plaintiffs argue that the "delay rental" provision gave the Lessee the option to make an annual "delayed rental" payment to the Griffiths, but only "during the primary term." Plaintiff therefore argues that, upon the expiration of the primary term on June 13, 2012, the Griffiths Lease terminated pursuant to the "delay rental" provision. Notably, the Griffiths have presented evidence that they did not cash the delay payments tendered in 2010 and 2011, nor the extension payment tendered in 2012. Although Hess does not dispute that the Griffiths did not cash the

4

2011 delay rental check or the 2012 extension payment check, Hess does assert that the Griffiths cashed the check for the 2010 delay rental payment. *See S. Griffith Depo.* at 46-52; *M. Griffith Depo.* at 45; Depo. Exs. C, D, E.; *S. Griffith Depo.* at 52-53; *M. Griffith Depo.* at 45, 59, Ex. F.

### 3. Cameron Lease Term

The Cameron Lease also contains a "habendum clause," which provides:

> It is agreed that this lease shall remain in force for a term of five (5) year(s) from [June 27, 2008], and as long thereafter as oil or gas . . . or either of them, is produced from said land by the Lessee, its successors and assigns. Lessee has the option to extend this lease for an additional term of five (5) years(s) [sic] from the expiration of the primary term of this lease, and as long thereafter as oil or gas … or either of them is produced from said land by the Less, its successors and assigns, said extension to be under the same terms and conditions as contained in this lease. Lessee, its successors or assigns, may exercise this option to extend if on or before the expiration date of the primary term of this lease, Lessee pays or tenders to the Lessor or to the Lessor's credit, an amount per net mineral acre covered under that certain un-recorded Bonus and Rental Agreement between Lessor and Less of even date hereof.

Cameron Lease ¶ 2. Under the habendum clause of the Cameron Lease, the Cameron Lease was scheduled to expire on June 27, 2013.

Contemporaneously with the Cameron Lease, Cameron signed an Order of Payment and Bonus and Rental Agreement ("Order of Payment"), (Doc. 37-7), which provides that, "[i]f any of the following [Order of Payment] provisions conflict with or are inconsistent with any of the printed provision or terms of the [Cameron] Lease, the following provisions shall control." The Cameron Order of Payment contains a "delay rental" provision that is similar, but not identical, to that contained in the Griffiths Lease:

> If operations for drilling are not commenced on the leased premises, or on acreage pooled therewith, on or before twelve (12) months from [June 27, 2008], this lease shall then terminate as to both parties unless Lessee, on or before the expiration of said period, shall pay or tender to Lessor the sum of One Hundred and no/100 ($100.00) Dollars per net mineral acre of the associated lease, hereinafter called the "delay rental," which shall extend for twelve (12) months the time within which drilling operations may be commenced. . . . Lessee has the

option to extend this lease for an additional term of five (5) years(s) from the expiration of the primary term of this lease, and as long thereafter as oil and gas. . . is produced from said land by the Lessee, its successors and assigns, said extension to be under the same terms and conditions as contained in this lease. Lessee, its successors or assigns, may exercise this option to extend if on or before the expiration date of the primary term of this lease, Lessee pays or tenders to the Lessor or to the Lessor's credit, the amount of Five Hundred and no/100 ($500.00) Dollars per net mineral acre.  Thereafter, if operations for drilling are not commended on the leased premises, or on acreage pooled therewith, on or before twelve (12) months from this date, the lease shall then terminate as to both parties unless Lessee, on or before the expiration of said period, shall pay or tender to Lessor the sum of One Hundred and no/100 ($100.00) Dollars per net mineral acre of the associated lease, hereinafter called the "delay rental," which shall extend for twelve (12) months the time within which drilling operations may be commenced.

*Order of Payment.*

It is undisputed that, to date, no drilling activity of any kind has taken place on either the Griffith or Cameron properties, and Plaintiffs have received no royalties of any kind under the terms of their respective leases.

Upon signing the Cameron Lease, Cameron received and accepted a bonus payment of $16,363.00 (equivalent to one year's delay rental payment). *Cameron Depo*. at 50-55. In addition, after the initial delay rental payment, the Lessee made four additional payments to Cameron in the amount of $16,363.00 each, all of which were labeled "Delay Rental," and accompanied by a letter specifically that referenced the payments as an "Annual Rental payment" and noted the particular annual period to which such payment was intended to apply.[2] It is undisputed that Hess has not tendered the $500.00 per net mineral acre needed to extend the Cameron Lease for an additional five (5) years.  For the purposes of Plaintiffs' motion for summary judgment, Cameron does not dispute that Hess (or its processor in interest, Marquette)

---

[2] Hess sent the forth payment to Cameron after this lawsuit was filed and after Cameron's deposition was taken. Cameron accepted and cashed the fourth payment, marking it "signing under protest."

attempted all payments called for under the Cameron Lease and Order of Payment. (Doc. 37-1 at 3.)

Hess argues that, pursuant to the habendum clause of the Cameron Lease, the primary lease term is five years. Hess further contends that, based on the Lessee's tender of five delay rental payments, Hess has satisfied its obligations pursuant to the Cameron Lease and Order of Payment and that, therefore, these agreements have not terminated pursuant to "delay rental" provision of the Order of Payment.

Cameron, in contrast, contends that the Order of Payment's "delay rental" provision provides only for the opportunity to delay drilling for two (2) twelve (12) month periods (i.e., to make only two initial annual delay rental payments), and thereafter terminates the lease unless the Lessee makes the requisite payment to extend the lease for an additional five year term. Plaintiffs therefore argue that, because the Order of Payment supersedes conflicting provisions in the Cameron Lease, the "delay rental" provision modifies the Cameron Lease to create a two-year primary term, ending on June 26, 2010. Because Hess made no extension payment prior to that date, Cameron asserts that the Cameron Lease and the Order of Payment in fact terminated on June 26, 2010. Hess disputes Plaintiffs' construction of the Order of Payment, and asserts that the five-year primary term referenced in the Cameron Lease governs here. Hess further argues that the delay rental payments tendered by the Lessee preserved Hess's drilling rights for the entirety of the five-year term of the Cameron Lease, i.e. through June 27, 2013. The record does not reflect whether Hess made any extension payment prior to the expiration of the purported five-year term.

*B. Procedural History*

On January 12, 2012, Plaintiffs commenced this action in the Jefferson County Court of Common Pleas as a State class action seeking declaratory judgment relative to the Griffiths Lease and the Cameron Lease. Pursuant to 28 U.S.C. §§1441, 1446 and 1453, Hess removed the matter to this Court on February 23, 2012.

Plaintiffs' First Amended Complaint, filed on November 28, 2012, asserts the following claims against Mason Dixon and Hess: (I) Declaratory Judgment – Oil Pooling Rights; (II) Unconscionability; (III) Unjust Enrichment; (IV) Declaratory Judgment – Improper Notary Provision; (V) Declaratory Judgment – Missing Signatory; and (VI) Declaratory Judgment – Order of Payment Provision. (Doc. 30.) On December 12, 2012, Hess filed a joint Answer and Counterclaim to the First Amended Complaint, asserting the following causes of action: (I) Declaratory Judgment – Cameron Lease; (II) Declaratory Judgment – Griffiths Lease; (III) Breach of Contract – Cameron Lease; (IV) Breach of Contract – Griffiths Lease; (V) Anticipatory Breach of Contract – Cameron; (VI) Anticipatory Breach of Contract – Griffiths; (VII) Unjust Enrichment – Cameron; and (VIII) Unjust Enrichment – Griffiths. (Doc. 32.)

In their January 11, 2013 Motion for Partial Summary Judgment, Plaintiffs seek adjudication of Count VI of the First Amended Complaint, as well as Counts I and II of Hess's Counterclaim. (Doc 37-1 at 1.) For the purposes of their Motion for Partial Summary Judgment only, Plaintiffs assume the validity of both the Cameron and Griffiths Leases. (Doc. 37-1 at 9.) In its Cross-Motion for Summary Judgment, filed on February 22, 2013, Hess seeks summary judgment in their favor on the same claims. (Doc. 42 at 1.) In addition, March 18, 2013, Mason Dixon moved for summary judgment on all Plaintiffs' claims against them. (Doc. 51 at 1-2.) These matters have fully briefed and are, therefore, ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if proof of that fact would establish one of the elements of a claim and would affect the application of governing law to the rights of the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis, Wyo.*, 542 P.2d 867, 872 (1975)).

A movant for summary judgment meets its initial burden "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Dixon v. Anderson*, 928 F.2d 212, 216 n. 5 (6th Cir.1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986)). At that point, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Id*. (quoting Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). It is not, however, the role of the trial court to "resolve factual disputes by weighing conflicting evidence because it is the jury's role to assess the probative value of the evidence." *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 230 (6th Cir. 1990) (citing *Stone v. William Beaumont Hosp.,* 782 F.2d 609, 615 n.5 (6th Cir. 1986); *Kennett-Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir. 1980)). All evidence and reasonable inferences must be viewed in the light most favorable to the party opposing the motion. *Pucci*, 628 F.3d at 759 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. ANALYSIS

### A. Cross-Motions of Plaintiffs and Hess for Partial Summary Judgment

Plaintiffs and Defendant Hess have made cross-motions for summary judgment on Count VI of Plaintiffs' First Amended Complaint and Counts I and II of Hess's Counterclaim. Count

VI of Plaintiffs' First Amended Complaint seeks a declaration of rights under the Cameron Order of Payment.   Counts I and II of Hess' Counterclaim seek a declaratory judgment relative to the rights and obligations between the parties for the Cameron Lease and Griffiths Lease, respectively.

Oil and gas leases are contracts subject to the well-settled rules of contract construction and interpretation.  *See, e.g. Burner-Morgan-Stephens Co. v. Wilson*, 586 N.E.2d 1062 (Ohio 1992); *Phillips Exploration, Inc. v. Reitz*, No. 2:11-cv-920, 2012 WL 6594915 (S.D. Ohio Dec. 18, 2012). Under Ohio law, interpretation of a written contract is a matter of law for initial determination by the Court.  *Construction Interior Sys., Inc. v. Marriott Family Rests., Inc.*, 984 F.2d 749, 754 (6th Cir. 1993) (applying Ohio law); *see also Long Beach Ass'n, Inc. v. Jones*, 697 N.E.2d 208, 209 (Ohio 1998).  Moreover, contract interpretation is only turned over to the fact-finder when the relevant contract language is ambiguous.  *Potti v. Duramed Pharms., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (applying Ohio law) (citing *Bahamas Agric. Indus., Ltd. v. Riley Stoker Corp.*, 526 F.2d 1174, 1179 (6th Cir. 1975)).  The Court decides whether a contract is ambiguous as a matter of law.  *Id.* (citing *D.L. Baker & Co. v. Acosta,* 720 F.Supp. 615, 618 (N.D. Ohio 1989)).

## 2. Declaratory Judgment – Griffiths Lease (Count II of the Counterclaim)

With respect to the Griffiths, the question before this Court on summary judgment is whether the Griffiths Lease remains valid and enforceable, or whether it has terminated on its own terms. At the behest of the parties, for the purposes of determining the respective rights and obligations of the parties under the Griffiths Lease, this Court assumes – without deciding – that there was no defect in the Griffiths Lease, and that Hess has made all delay rental and extension payments required under its terms.

As described above, Plaintiffs argue that the "delay rental" provision of the Griffiths Lease gave the Lessee the option to make an annual "delayed rental" payment to the Griffiths, but only "during the primary term." Griffith Lease ¶ 4 ("Thereafter, annually, in like manner and upon like [delay rental] payments or tenders, the commencement of drilling operations may be further deferred for periods of twelve (12) months each *during the primary term*.") (emphasis added). As such, Plaintiff argues that – even though Hess made the requisite payment to extend the lease term for an additional five years – the Griffiths Lease does not authorize Hess to use annual delay payments to postpone drilling during that secondary term. Plaintiff therefore argues that the Griffiths Lease automatically terminated on June 13, 2012, pursuant to the "delay rental" provision.

Hess counters that Plaintiffs' interpretation of the "delay rental" provision would render the habendum clause's five-year-extension language meaningless. Accordingly, Hess urges this court to interpret the phrase "primary term" in the "delay rental" provision to mean "the initial five year primary term *and* [the lease term] as extended." (*Def.'s Cross-Motion*, Doc. 42 at 11.) Under that construction of the Griffiths Lease, the Lessee's obligation to commence drilling may be delayed by delay rental payments for a full ten years. Thus, Hess argues, because the Lessee has tendered all requisite delay rental and extension payments pursuant to its obligations under the Griffiths Lease, the Griffiths Lease remains valid and enforceable and has not terminated.

The plain language of the Griffiths Lease does not support Hess's position that the phrase "primary term" refers to both the initial five year term and any subsequent extension. Indeed, in authorizing the extension of the lease, the habendum clause grants the Lessee "the option to extend this lease for an additional term of five (5) years(s) *from the expiration of the primary term* of this lease, and as long thereafter as oil or gas … or either of them, is produced from said

11

land ….."  Griffith Lease ¶ 2 (emphasis added). Thus, the contractual language defines the "additional term" relative to, and as distinct from, the "primary term."  Indeed, pursuant to this provision, the "primary term" must actually expire before the "additional term" can commence. *See Black's Law Dictionary* (9th ed. 2009) (defining "expiration" to mean "[a] coming to an end; esp., a formal termination on a closing date").

Ohio courts have regularly encountered habendum clauses in oil and gas leases that provide for primary and secondary terms, and recognized that terms of the contract may impose distinct obligations for each. *See, e.g., Am. Energy Sev. V. Lekan*, 598 N.E.2d 1315, 1319-20 (Ohio Ct. App. 1992) (interpreting a habendum clause to mean that "[i]f after the expiration of the primary term *the conditions of the secondary term* are not continuing to be met, the lease terminates by the express terms of the contract herein and by operation of law and revests the leased estate in the lessor") (emphasis added); *Moore v. Adams*, No. 2007-AP-90066, 2008 WL 4907590, ¶¶ 26-28 (Ohio Ct. App. Nov. 17, 2008) (noting that an oil and gas habendum clause has two parts – a primary term and a secondary term – that impose distinct conditions).   As such, where the language of a habendum clause creates two distinct terms – here, a "primary term" and an "additional term" created by an extension payment – this Court cannot infer that conditions that expressly apply to the "primary term" also automatically apply to the "additional term." Had the parties intended this result, they could have so contracted.

By way of example, the oil and gas lease at issue in *Phillips Exploration, Inc. v. Reitz*, No. 2:11-cv-920, 2012 WL 6594915, (S.D. Ohio Dec. 18, 2012), included the following language:

> *EXTENSION.* This lease may, at Lessee's option, be extended as to all or part of the lands covered hereby for *an additional primary term* of FIVE (5) years commencing on the date that this lease would have expired but for the extension. Lessee may exercise its option by paying or tendering to Lessor an extension

> payment of $40.00 per net acre for the land then covered by the extended lease.... If Lessee exercises this option, *the primary term of this lease shall be considered to be continuous,* commencing on the date of the lease and continuing from that date to the end of the extended primary term....

*Id*. at *1 (emphasis added).  Although *Phillips Exploration* did not consider the question of whether delay rental payments were applicable to the extension period, the extension language at issue there demonstrates the potential for parties to choose to define the phrase "primary term" to include any subsequent extensions.  Here, in contrast, the express terms of the Griffiths Lease contains no support for interpreting the phrase "primary term," as used in the "delay rental" provision, to include the "additional term" created by an extension payment.  *See Kelly v. Med. Life Ins. Co*., 509 N.E.2d 411, 411 (Ohio 1987) ("The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.").

Hess also argues that the above interpretation of the "delay rental" provision renders the "additional term" language of the habendum clause meaningless. This argument is similarly unpersuasive.  Ohio law mandates that "a contract must be construed in its entirety and in a manner that does not leave any phrase meaningless or surplusage." *Phillips Exploration*, 2012 WL 6594915 at *4 (quoting *Local Mktg. Corp. v. Prudential Ins. Co.,* 824 N.E.2d 122, 125 (Ohio Ct.App. 2004).  This canon of construction, however, does not preclude a reading of the Griffiths Lease in which the "delay rental" provision applies only to the "primary term" of the lease.  Indeed, the habendum clause provides for an extension "for an additional term of five (5) years(s) from the expiration of the primary term of this lease, *and as long thereafter as oil or gas ... or either of them, is produced from said land* ...."  Griffiths Lease ¶ 2 (emphasis added). Thus, this language can be read to authorize an extension of the lease term only where the Lessee actually commences drilling on the lease premised.  Harmonizing this provision with the "delay rental" provision – which, as discussed above, does not permit a delay rental payment to forestall

the termination of the lease during the "additional term" – the Lessee would have at most twelve (12) months from the advent of the "additional term" in which to commence drilling.  Because, here, the first year of the "additional term" has come and gone and drilling has not commenced, the Griffiths Lease has, by its terms, "terminate[d] as to both parties." Griffiths Lease ¶ 4.[3]

Hess also argues that, in order to terminate the lease, the Griffiths were obligated to notify the Lessee in writing pursuant to either paragraph 10 or 17 of the Griffiths Lease. Paragraph 10 provides:

> Failure to pay or error in paying any rental or other payments due hereunder shall not constitute a ground for forfeiture of this lease and shall not affect Lessee's obligation to make such payment, but Lessee shall not be considered in default on account thereof until Lessor has first given Lessee written notice of the nonpayment and Lessee shall have failed for a period of thirty (30) days after receipt of such notice to make payment.

Griffiths Lease, ¶ 10.  For the purposes of these motions for summary judgment, however, Plaintiffs do not assert that the Lessee failed to make any payments required under the Griffiths Lease.  Accordingly, the notice requirement of paragraph 10 is not applicable here.  Similarly, paragraph 17 of the Griffiths Lease requires that the Lessor given written notice "[i]n the event Lessor considers that the Lessee has not complied with its express or implied obligations" under the lease.  But, again, Plaintiffs do not contend that the Griffiths Lease is terminated due to breach, but rather that the lease automatically "terminate[d] as to both parties" by virtue of the Lessee's failure to commence drilling.  Accordingly, the notice provision at paragraph 17 is not

---

[3] Notably, in so interpreting the Griffiths Lease, the Court does not rely on Plaintiffs' arguments that a contrary construction is prohibited by Ohio public policy.  Plaintiffs argue that length that Ohio's public policy imports into oil and gas contracts an implied duty to reasonably land, which prevents Hess from holding the Griffiths Lease for ten years "without EVER having the obligation to drill a single hole – so long as it timely tenders all delayed rental payments called for under the lease." (*Pl.'s Brief*, Doc. 37-1 at 13.) As this Court has previously explained, however, courts have found certain leases to be void and unenforceable as violative of Ohio public policy supporting production of oil and gas in cases where they authorize "perpetual extensions that would present a 'no term' lease." *Phillips Exploration*, 2012 WL 6594915 at *5. Here, in contrast, even if the Griffiths Lease permitted delay payments for a full ten years, it would not be a "perpetual lease" of the type singled out by Ohio case law. *See id*. at *5-6.

applicable to the matter *sub judice*. As such, Plaintiffs' failure to give notice pursuant to provisions 10 and 17 does not resurrect the Griffiths Lease.

Based on the above, the Court finds that the Griffiths lease is unambiguous as a matter of law, and automatically terminated by its terms as of June 2013. Therefore, Plaintiff's motion for summary judgment is **GRANTED** and Defendant's cross-motion for summary judgment is **DENIED** as to Count II of Hess's counter claim.

### 2. Declaratory Judgment – Cameron Lease and Order of Payment

Because Count VI of the First Amended Complaint and Count I of the Counterclaim both seek declaratory judgment as to the parties' rights and obligations under the Cameron Lease and Order of Payment, the Court will consider those causes of action together. With respect to Cameron, the question before this Court is on summary judgment is whether – in light of the corresponding Order of Payment – the Cameron Lease remains valid and enforceable, or whether it has terminated on its own terms. At the behest of the parties, in determining the respective rights and obligations of the parties under the Cameron Lease and Order of Payment, we assume – without deciding – that there was no defect in those agreements, and that Hess has made all delay rental and extension payments required under their respective terms.

Like the Griffiths Lease, the Cameron Lease contains a habendum clause that provides for a five year "primary term," and an option for the Lessee to extend the lease "for an additional term of five (5) years(s) [sic]" by tendering an extension payment. Cameron Lease ¶ 2. Hess argues that this clause covers the duration of the primary term, and that therefore the "primary term" Cameron Lease was scheduled to expire on June 27, 2013. Cameron, however, argues that the "delay rental" provision in the Order of Payment supersedes the five-year primary term of the Cameron Lease, and instead imposes a two-year primary term, and thereafter requires a five year

extension payment to avert termination of the lease. *See Order of Payment* (providing that "[i]f any of the following [Order of Payment] provisions conflict with or are inconsistent with any of the printed provision or terms of the [Cameron] Lease, the following provisions shall control").

The "delay rental" provision of the Order of Payment provides that:

> If operations for drilling are not commenced on the leased premises… on or before twelve (12) months from [June 27, 2008], this lease shall then terminate as to both parties unless Lessee, on or before the expiration of said period, shall pay or tender to Lessor … the "delay rental," which shall extend for twelve (12) months the time within which drilling operations may be commenced.

The Order of Payment further provides that the "Lessee has the option to extend this lease for an additional term of five (5) years(s) from the expiration of the primary term of this lease," and that, thereafter:

> [I]f operations for drilling are not commended on the leased premises, or on acreage pooled therewith, on or before twelve (12) months from [the advent of the "additional term"], the lease shall then terminate as to both parties unless Lessee, on or before the expiration of said period, shall pay or tender to Lessor … the "delay rental," which shall extend for twelve (12) months the time within which drilling operations may be commenced.

Conspicuously absent from the Order of Payment is language equivalent to that found in the Griffiths Lease, which authorizes annual "delay rental" payments throughout the applicable lease term.  *Contrast* Griffiths Lease at ¶ 4 ("Thereafter, annually, in like manner and upon like payments or tenders, the commencement of drilling operations may be further deferred for periods of twelve (12) months each during the primary term."). This fact lends substantial support to Cameron's position that the Order of Payment imposes a two-year primary term, and then provides for a five-year extension that terminates after a maximum of two years, if drilling has not yet commenced.

Hess argues that, though the Order of Payment neglected to reference explicitly the option to make more than one annual "delay rental" payment during the primary term, this does

not necessarily "conflict with," nor is it "inconsistent with" the habendum clause of the Cameron Lease.  Indeed, as Hess correctly notes, even if the Order of Payment and the Cameron lease are found to be conflicting, the Court's construction of the lease should attempt to harmonize all provision of the document, and should not dismiss any provision as inconsistent of there exists a reasonable interpretation that gives effect to both.  *See Farmers' Nat'l Bank v. Delaware Ins. Co.*, 94 N.E. 834, 839 (Ohio 1911) ("The plain rule of construction requires that every provision of a contract shall be given effect if possible."); *Expanded Metal Fireproofing Co. v. Noel Const. Co.*, 101 N.E. 348, 350 (Ohio 1913) ("No provision of a contract is to be disregarded as inconsistent with other provisions, unless no other reasonable construction is possible. A special provision will be held to override a general provision only where the two cannot stand together.")  Thus, Hess argues, the Cameron Lease's habendum clause should be harmonized with the Order of Payment's "delay rental" provision to preserve the five-year primary term and, at minimum, authorize "delay rental" payments annually for every year thereof.   This interpretation is also compelling, particularly given that the Order of Payment nowhere explicitly purports to redefine the phrase "primary term."

In reviewing the four corners of the contracts here at issue, the Court finds that both Cameron and Hess have proffered reasonable interpretations that resolve in very different ways the apparent inconsistencies between habendum clause's five-year "primary term" and five-year "additional term," and the Order of Payment's express authorization of two initial "delay rental" periods and subsequent acknowledgement that drilling may not have commenced by the advent of the "additional term." Accordingly, the Court finds that the Cameron Lease and the Order of Payment are ambiguous as a matter of law.  *See Potti*, 938 F.2d at 647 ("[T]he determination whether a contract is ambiguous is made as a matter of law by the court.") ("Ambiguity exists …

17

where contract language is susceptible to two or more reasonable interpretations.") (citing *Wells v. American Elec. Power Co.*, 548 N.E.2d 995 (Ohio 1988)).

That the interaction between the Cameron Lease and the Order of Payment is ambiguous is supported by the extrinsic evidence in record.  At his deposition, Cameron testified that, when he signed the lease documents, he understood the contracts to grant the Lessee drilling rights for a primary term of five years, with "delay rentals" payable for each year of the primary term.[4] Furthermore, because Hess tendered, and Cameron accepted, four payments explicitly labeled "Delay Rental," the record indicates that Cameron and Hess engaged in a course of conduct that arguably supports a finding that the parties intended the Cameron lease to remain in force for a primary term of five years, provided that the lessee pay a "delay rental" each year it did not commence drilling during that term. Thus, the Court concludes that the ambiguity of the Cameron Lease and Order of Payment creates a disputed question of material fact as to the parties' intent that precludes summary judgment for either party.  *See Potti*, 938 F.2d at 647 ("[W]hen the relevant contract language is ambiguous … the job of interpretation is turned over to the fact finder.").

---

[4] *See D. Cameron Depo.* pp. 33-34:

> Q: Let's take it two steps at a time. You were supposed to receive a bonus, correct?
> A: Yes.
> Q: And then you were supposed to receive something annually, correct?
> A: Yes, ma'am.
> Q: For five years?
> A: Well, it was for five years, then they had the right to renew it for five.
> Q: And then they had the right to renew it, correct. But in the primary term of the lease, it was for five years?
> A: Yes.
> Q: It was supposed to be a hundred dollars first, second, third, fourth, year; sixth year went up to $500 an acre.
> A: Sixth, seventh year it was a hundred, eighth year it was a hundred, ninth year a hundred.

Based on the above, Plaintiffs' motion for summary judgment is **DENIED** and Hess's motion for summary judgment is **DENIED** as to Count VI of the First Amended Complaint and Count I of Hess's Counterclaim.

### B. Mason Dixon's Motion for Summary Judgment

Defendant Mason Dixon moves for summary judgment on all claims asserted against them in Plaintiffs' First Amended Complaint, on the basis that Mason Dixon assigned the Griffiths and Cameron Leases and therefore has no present relationship with Plaintiffs or their property, nor any rights or responsibilities under the leases.  Plaintiffs do not dispute that Mason Dixon has assigned their leasehold interests in the Griffiths and Cameron Leases. (*Pl.'s Mem. in Opp*., Doc. 53, 4.)

In Counts I, II, IV, V, VI and VII of the First Amended Complaint, Plaintiffs "seek a declaration of their rights relative to the Leases." (*Id*. at 3.) As such, Plaintiffs "readily concede that the declaration of rights flowing from this action will impact Plaintiffs and the current owner of the leasehold interest(s)."  (*Id*.) In assigning the Griffiths and Cameron Leases, however, Mason Dixon extinguished all of its rights in those contracts under Ohio law.  In alienating property via an assignment, the assignee "acquires" all attendant property rights, and the rights of the assignor are "extinguished." 6 Am. Jur.2d, *Assignments* § 1 (2012) ("an assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished ... and the assignee acquires a right to such performance...."); *W. Broad Chiropractic v. Am. Family Ins.*, 912 N.E.2d 1093, 1095 (Ohio 2009) ("An assignment is a transfer to another of all or part of one's property in exchange for valuable consideration").  As a result, "an assignee … stands in the shoes of the assignor …, and succeeds to all the rights and remedies of the latter."  *Inter Ins. Exch. of Chi. Motor Club v.*

*Wagstaff*, 59 N.E.2d 373, 375 (Ohio 1945) (citing 3 Ohio Jurisprudence, 275, § 32; 38 Ohio

Jurisprudence, 300, § 51; 4 American Jurisprudence, 321, § 115; 50 American Jurisprudence,

752, § 110; 6 C.J.S., Assignments, § 85, p. 1142.).   Thus, here, in assigning the Griffiths and

Cameron Leases, Mason Dixon has no remaining interests in the leaseholds that might be

adjudicated in Plaintiffs' declaratory judgment action.  *See Ford Motor Credit Co. v. Ryan*, 939

N.E.2d 891, 921 (Ohio Ct. App.  2010) (affirming summary judgment for defendant on breach of

contract claims because defendant had assigned its interest in the contract to another party).

Plaintiffs counter that Mason Dixon has not actually extinguished all interests in the

Griffiths and Cameron Leases because the operable assignments contained a warranty by which

the lease's assignees could require Mason Dixon, under certain circumstances, to "defend title to

the interest conveyed [by the assignment] against the claims and demands of all persons

whomsoever claiming or attempting to claim the same…."  This warranty provision concerns the

rights of assignees Marquette and Hess relative to Mason Dixon, and speaks not at all to any

rights Plaintiffs may have relative to Mason Dixon, or vice versa.  In any case, because Hess has

not asserted any cross-claim for breach of warranty of title against Mason Dixon, the question of

what rights may be conferred by the above warranty provision is irrelevant to the matter *sub

judice*.  In light of the above, Mason Dixon's Motion is **GRANTED** as to Counts I, II, IV, V, VI

and VII of the First Amended Complaint.

Mason Dixon also moves this Court to grant summary judgment as to Plaintiffs' claims

for unjust enrichment (Count III). Under Ohio law, "unjust enrichment occurs when a person

'has and retains money or benefits which in justice and equity belong to another.' " *Johnson v.

Microsoft Corp.,* 106 Ohio St.3d 278, 283, 834 N.E.2d 791 (Ohio 2005) (quoting *Hummel v.

Hummel,* 133 Ohio St. 520, 528, 14 N.E.2d 923 (Ohio 1938)). As such, "The purpose of an

unjust enrichment claim is not to compensate a party for any loss or damage suffered by him, but to reimburse him for the benefit he has conferred on another." *Shively v. MPW Indus. Water Svcs., Inc.*, N. 2:10-cv-10, 2010 WL 2696806, at *3 (S.D. Ohio July 6, 2010) (citing *Hughes v. Oberholtzer,* 123 N.E.2d 393 (Ohio 1954)).

In Ohio, a plaintiff must satisfy three elements to state a claim for an unjust enrichment claim:  (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment.  *Hambleton v. R.G. Barry Corp.,* 465 N.E.2d 1298 (Ohio 1984). Furthermore, "a claim for unjust enrichment will not be satisfied if a party can only show that it has conferred a benefit upon another; it must be proven, by the party claiming unjust enrichment, that it would be unconscionable for the other party to retain the benefit." *Shively*, 2010 WL 2696806, at *3 (citing *Cincinnati v. Fox,* 49 N.E.2d 69 (Ohio Ct. App. 1943)).  In addition, "there must be a 'tie of causation' between the plaintiff's loss and the defendant's benefit." *Bower v. Intern'l Bus. Machines, Inc*., 495 F.Supp.2d 837, 844 (S.D. Ohio 2007) (citing *Laurent v. Flood Data Serv., Inc.,* 766 N.E.2d 221, 226 (Ohio Ct. App. 2001)).

Here, Plaintiffs argue that they conferred on Mason Dixon the benefit of leasehold interests, and that Mason Dixon was able to profit by assigning those interests. (*Pl.'s Mem. in Opp*., Doc. 53, 8-9.) Mason Dixon argues that it received no benefit from its assignment of the Griffiths and Cameron Leases.  Specifically, Mason Dixon provides affidavit evidence that in August 2006, Mason Dixon was retained by Marquette "to research, negotiate and lease oil and gas rights in Jefferson County, Ohio," and the terms of Mason Dixon's agreement with Marquette required Mason Dixon "to take the leases in its own name [and] then … assign the leases to market at a later date."  (*Bowers Aff*., Doc. 54-1, ¶ 10.) Mason Dixon's representative

avers that, pursuant to that agreement, Mason Dixon entered into approximately 308 oil and gas leases that were subsequently assigned to Marquette, including the Griffiths and Cameron Leases.  (*Id*. at ¶¶ 11-12.)   Hence, Mason Dixon argues that it made no additional or separate profit from the assignment of the Griffiths and Cameron Leases to Marquette because those assignments "fell within the scope of Mason Dixon Energy's overall project agreement with Marquette." (*Id*. at ¶ 13.)

Based on the above, this Court does not find, as a matter of law, that Mason Dixon incurred no benefit from the Griffiths and Cameron Leases.  Although it is unclear how Mason Dixon was compensated for its services in procuring oil and gas leases, or whether Marquette required Mason Dixon to procure some threshold number of leases and/or mineral acres, etc., at minimum Mason Dixon's actions in securing the Griffiths and Cameron Leases served its interests in fulfilling its contractual obligations to Marquette. As such, viewing these facts in the light most favorable to the non-moving party, a reasonable jury could conclude that Mason Dixon did derive a benefit from Plaintiffs because its actions in procuring the leases enabled Mason Dixon to fulfill its obligations to Marquette and to profit thereby.  Furthermore, drawing all reasonable inferences from the facts above, a reasonable jury could likewise conclude that Mason Dixon would have known that it stood to benefit from executing the Griffiths and Cameron Leases, or it would not have done so. Thus, there exist genuine issues of material fact as to whether Plaintiffs are able to satisfy the first and second elements of an unjust enrichment claim with respect to Mason Dixon.

Plaintiffs further argue that it would be unjust for Mason Dixon to retain this benefit because Mason Dixon's conduct in procuring the Griffiths and Cameron leases was "at best grossly negligent, and at worst, purposely deceitful."  (*Id*. at 6.)  As evidence of these unfair

business practices, Plaintiffs point to the evidence in the record of the irregularities in the execution of the leases at issue, including: 1) Mason Dixon's representative directing Stephen Griffith to sign the Griffiths Lease on his wife's name, and subsequently notarizing the document; and 2) Mason Dixon's representative directing Cameron to sign the Cameron Lease and Order of Payment, and then taking it to be notarized outside Cameron's presence.  *S. Griffith Depo.*, pp. 31-32; *Cameron Depo.*, p. 27.  Viewed in the light most favorable to the Plaintiffs, there is a causal connection between Plaintiffs losses from the leases and Defendant's conduct. *Laurent,* 766 N.E.2d at 226 ("The plaintiff must confer the benefit as a response to fraud, misrepresentation, or bad faith on behalf of the defendant. That is, there must be a tie of causation between the plaintiff's loss and the defendant's benefit.") (internal citations omitted) (citing *Natl. City Bank v. Fleming* 440 N.E.2d 590 (Ohio 1981); *Elbert v. West*, 1986 WL 9131, at *5 (Ohio Ct. App. Aug. 20, 1986)). Although Mason Dixon disputes that it engaged in unfair or deceptive business practices in securing the Griffiths and Cameron Leases, Plaintiffs have created a disputed issue of material fact as to whether it would be just for Mason Dixon to obtain any benefit obtained from its conduct toward them.  *Shively*, 2010 WL 2696806, at *3 (citing *Cincinnati v. Fox,* 49 N.E.2d 69 (Ohio Ct. App. 1943)).

Finally, Mason Dixon argues that Plaintiffs may not state a claim for unjust enrichment in light of the existing contracts.  Under Ohio law, a plaintiff cannot sustain a quasi-contract claim, such as unjust enrichment, where there is an express contract covering the same subject matter. *Arcade Co. Lt. V. Arcade, LLC*, 105 Fed. Appx. 808, 811 (6th Cir. 2004) (citing *Williams v. Goodyear Aircraft Corp.,* 85 N.E.2d 601, 604 (1948) ("The law does not recognize the coexistence of a quasi contract and an express contract covering the same subject.")).  Here, however, there exists a disputed question of material fact as to whether the Griffiths and

Cameron Leases were invalid and/or unenforceable due to various defects in their execution; indeed, in considering Plaintiffs' and Hess's motions for summary judgment, this Court assumed rather than decided that the relevant contracts were valid and enforceable.  As such, until there is an actual determination that express contracts exist, Plaintiffs may sustain parallel claims for unjust enrichment.  *See Shively*, 2010 WL 2696806, at *4 (denying motion to dismiss in the absence of a valid and enforceable written contract) (citing *Williams,* 85 N.E.2d at 604).

In light of the above, the Court finds there are disputed issues of material fact that preclude summary judgment as to Plaintiffs' unjust enrichment claims against Mason Dixon. Mason Dixon's Motion is **DENIED** as to Count III of the First Amended Complaint.

## V. CONCLUSION

For the reasons set forth herein, Plaintiffs' Motion, (Doc. 37), is **GRANTED** in part and **DENIED** in part; Hess's Motion, (Doc. 42), is **DENIED**; and Mason Dixon's Motion, (Doc. 51), is **GRANTED** in part and **DENIED** in part.

IT IS SO ORDERED.

s/Algenon L. Marbley
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATE: September 24, 2013**